IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

GARY THOMPSON, ET AL.                                    PLAINTIFFS

VS.                                    CIVIL ACTION NO. 3:04CV837BN

SANDERSON FARMS, INC.                                    DEFENDANT


<u>OPINION AND ORDER</u>

This cause is before the Court on the Motion of Defendant Sanderson Farms, Inc. for Summary Judgment as to the claims of Perry White.  The Court has considered the Motion, Consolidated Response, Consolidated Rebuttal, relevant attachments to each, as well as supporting and opposing authorities and finds that the Motion should be granted in part and denied in part.


**I.   Factual Background and Procedural History**

The origin of the lawsuit is a Third-party Charge of Discrimination that was filed by the National Association for the Advancement of Colored People ("NAACP"), and certified by thirteen individuals, on October 23, 2002.  Although the named individuals were all employees of Sanderson Farms, Inc. (Production Division) the Charge was filed against its parent company, Sanderson Farms, Inc.[1]

---

[1]   For the purposes of this Opinion and Ordered, Sanderson Farms, Inc., will be referred to as "SFI"; Sanderson Farms, Inc. (Production Division), will be referred to as "SFI (Production)"; and Sanderson Farms Inc. (Processing Division), will be referred to as "SFI (Processing)".

The Charge alleged that SFI racially "discriminated against Blacks as a class, in violation of Title VII" with regard to promotions, discipline, wages, job assignments, and working conditions.  After the Third-party Charge was filed, over thirty additional African American employees of SFI (Production) and/or SFI (Processing) filed separate Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), each alleging race-based discrimination against SFI.

The EEOC failed to complete its investigation within 180 days.  Thereafter, the individuals who had certified the Third-party Charge and the individuals who had filed individual Charges of Discrimination petitioned for "Notices of Right to Sue," which were issued by the EEOC on or about April 30, 2003.  On May 19, 2003, a total of seventy-three African American plaintiffs filed a lawsuit in this Court alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. § 2000e *et seq.*, and in violation of the Civil Rights Act of 1866 and/or 1870, codified at 42 U.S.C. § 1981.  The case was styled Sherry Holmes, et al. v. Sanderson Farms, Inc., and was docketed as Civil Action No. 3:03cv699BN.  Plaintiffs did not seek class certification but, instead, joined to allege seventy-three individual claims of race-based discrimination.  On June 6, 2003, a First Amended Complaint was filed joining an additional thirteen plaintiffs.

On July 21, 2003, SFI filed a Motion to Dismiss or, alternatively, Motion for Summary Judgment or Motion for More Definite Statement ("Mot. to Dismiss"). In its Motion, SFI argued, *inter alia*, that Plaintiffs' claims were subject to dismissal on the basis that they had "not alleged facts to establish that the [SFI, SFI (Production), and SFI (Processing)] constitute a single employer as defined by Title VII, so as to impose liability on Sanderson Farms." Mot. to Dismiss, ¶ 16. The Court, based on the allegations in the Complaint and facts then before it, denied the motion finding that SFI and its subsidiaries could constitute a single employer. The Court ruled that SFI could re-file its Motion to Dismiss after Plaintiffs amended their complaint in accordance with the subject Order.[2]

---

[2]  In addition to seeking dismissal pursuant to Rule 12(b)(6) for failure to state a claim regarding whether it was Plaintiffs' employer, SFI moved, in the alternative, for a more definite statement. SFI also sought dismissal pursuant to Rule 12(b)(7) for failure to join United Food and Commercial Workers Union, Local 1529, the Union which represents hourly workers at SFI (Production) Feed Mill Department as a necessary party or, alternatively for an Order requiring that the Union be joined as a party in the lawsuit. Finally, SFI moved for dismissal of Plaintiffs' over-time claims on the basis of res judicata.

The Court granted both forms of alternative relief requested by SFI, and required Plaintiffs to amend their complaint to include more definite statements of fact regarding each Plaintiff's claims and to join the Union as a defendant. Plaintiffs' claims for over-time were dismissed based on the prior consent judgment entered in Elaine L. Chao, Secretary of Labor, United States Department of Labor v. Sanderson Farms, Inc., Sanderson Farms, Inc. (Production Division), Civil Action No. 2:99-cv-148GR, slip op. (S.D. Miss. Mar. 2002).

On January 27, 2004, Plaintiffs' Second Amended Complaint was filed. On August 26, 2004, Plaintiffs were severed based on their job classifications and ordered to re-file their claims as six separate lawsuits. The subject lawsuit, which was filed on October 12, 2004, is comprised of African American plaintiffs who are or were employed as live haul drivers by SFI (Production). On September 1, 2006, the Court further severed the <u>Thompson</u> Plaintiffs and ordered separate trials on each of their respective claims. Perry White was selected as the first plaintiff for trial.

White was hired as a live haul driver in February of 1998. In the Complaint, White alleges the following claims of discrimination: (1) disparate assignment/disparate pay based on allegations that a Caucasian live haul driver received better load assignments than he; (2) disparate discipline based on allegations that he was suspended under circumstances not provided for in the written company rules while Caucasian employees were not so disciplined; (3) disparate treatment/disparate pay based on allegations that he was sent home without pay because of an alleged lack of work while the supervisors created work for Caucasian employees; (4) disparate discipline/disparate treatment based on allegations that he was suspended and ultimately terminated for a roll-over accident while two Caucasian drivers were not suspended or terminated after similar accidents; and (5) that he received unfavorable job references following his termination.

SFI has now moved for summary judgment on all of White's claims.

## II.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also, Moore v. Mississippi Valley State Univ., 871 F.2d 545, 549 (5th Cir. 1989); Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir. 1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The movant need not, however, support the motion with materials that negate the op-

ponent's claim.  Id.  As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim.  Id. at 323-24.  The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Id. at 324.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. It is improper for the district court to "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence."  Kennett-Murray Corp. v. Bone, 622 F.2d 887, 892 (5th Cir. 1980).  Summary judgment is also improper where the court merely believes it unlikely that the non-moving party will prevail at trial.  National Screen Serv. Corp. v. Poster Exchange, Inc., 305 F.2d 647, 651 (5th Cir. 1962).

**III  Legal Analysis**

**A.   Is SFI White's employer for the purposes of Title VII?**

White's employer SFI (Production) is a wholly owned subsidiary of SFI.  See Resp. to Mot. For Summ. J., Ex. 17 (Romano Dep. at 24) ("Sanderson Farms, Inc. is the parent corporation of three wholly owned subsidiaries... Each subsidiary is a separately incorporated entity.").  White alleges that SFI and SFI (Production) should

nevertheless be treated as a single employer for the purposes of his discrimination claims.

The United States Court of Appeals for the Fifth Circuit has applied a broad definition to the term "employer" with relation to laws governing discrimination in the workplace.  Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 777 n.3 (5th Cir. 1997).  The broadness of the definition is, however, tempered by the important doctrines underlying limited liability.  See Id. (indicating that "approaches to piercing the corporate veil which fail to recognize the[] important public policy considerations underlying the [limited liability] doctrine 'are deficient.'").  "Accordingly, before piercing the corporate veil in the employment discrimination context," the Fifth Circuit has "focused on the core activities regulated by the anti-discrimination laws, and, therefore, on whether the parent corporation was so involved in the daily employment decisions of the subsidiary as to justify treating the two corporations as a single employer."  Id. (citations omitted). To determine whether a parent corporation and its subsidiary may be regarded as a "single employer" in civil rights litigation, the Court applies a four-part analysis.  See Lusk, at 777; Trevino v. Celanese Corp., 701 F.2d 397 (5th Cir. 1983).

> The four factors to consider include:  (1) interrelation of operations, (2) centralized control of labor or employment decisions, (3) common management, and (4) common ownership or financial control.  This analysis ultimately focuses on the question whether the parent corporation was a final decision-maker in

7

> connection with the employment matters
> underlying the litigation, and all four factors
> are examined only as they bear on this precise
> issue.

Lusk, 129 F.3d at 777 (alterations in original) (internal quotations omitted).

The Court finds that there is evidence of common management as the same individuals serve as corporate officers of SFI and SFI (Production).  See e.g. Baker v. Stuart Broadcasting Co., 560 F.2d 389, 392 (8th Cir. 1977) (finding common management in a case in which the parent and subsidiary had the same officers, directors, and president); EEOC v. Financial Assurance, Inc., 624 F. Supp. 686 (W.D. Mo. 1985) (finding common management in a case in which the same family often consulted regarding business matters and headed both the parent and subsidiary corporations).  The Court additionally finds that there is evidence of common ownership as SFI was formed by the Sanderson family, and a member of that family likely served as Chief Operating Officer and/or President at the time SFI (Production) was formed.  See Johnson v. Crown Enters., Inc., 398 F.3d 399, 343-44 (5th Cir. 2005)(finding common ownership in a case in which two companies were formed by the same individual).  Finally the Court finds that there is sufficient evidence to demonstrate an "interrelation of operations" first on the basis that SFI provided the vast majority, if not all, of the managerial and administrative services for SFI (Production), including veterinary services, quality control, sales, technical,

8

engineering, health and safety, insurance and risk management, human resources, accounting and financial analysis, financing and cash management, management information systems and data processing, purchasing and personal computer services, as well as legal and other professional services, pursuant to an Administrative Service Agreement.  See Resp. to Mot. for Summ. J., Ex. 17 (Romano Dep. at 65).[3]  Secondly, SFI had final authority to set the annual budgets of its subsidiaries, authorize capital expenditures, and make decisions or otherwise resolve problems that its subsidiaries are required to report on a daily basis.

White also alleges that SFI (Production) and SFI can be treated as a single employer based on the latter's control of labor or employment decisions.  See Complaint, ¶ 84.  In support of this allegation, White cites to various SFI policies that govern standard wages, vacation and sick leave, a tiered system of discipline, and sexual/racial harassment in the workplace that its subsidiaries are required to follow.  The Fifth Circuit has held that:  "A parent corporation's possession of a controlling interest in its subsidiary entitles the parent to the normal incidents of stock ownership, such

---

[3]  SFI produced a unsigned copy of the Administrative Services Agreement that identifies the services provided by SFI to SFI (Production), and the amount SFI (Production) pays to SFI for receipt of these services.  Although the Agreement is unsigned, Brian Romano, the Director of Administration for SFI, testified that the copy is "an accurate reflection of the fee arrangement that has been made between the parent and the subsidiaries for administrative services that the parent provides."  Resp. to Mot. for Summ J., Ex 17 (Romano Dep., at 65).

as the right to select directors and set general policies without forfeiting the protection of limited liability." <u>Lusk</u>, 129 F.3d at 778.  To be considered a single employer, "[s]ome nexus to the subsidiary's daily employment decisions must be shown."  <u>Id.</u>

SFI has produced evidence that each of its subsidiaries, including SFI (Production) employs its own Field Employee Relations Manager ("FERM") who is responsible for the human resources decisions for that location.  Resp. to Mot. for Summ. J., Ex. 1 (Wooten Dep., at 17).  The record also establishes, however, that the decisions made by the respective FERMs had to comply with the employment policies promulgated by SFI.  <u>Id.</u>, Ex. 46 (Cutrer Dep., at 38-39) (testifying that all employment decisions were made in accordance with the rules and policies of SFI).  <u>See</u> <u>also</u> <u>Id.</u>, Ex. 19 (Sanderson Dep., 21) (testifying that the Executive Committee of SFI decided to implement uniform work rules for hourly employees and that only the Executive Committee had the authority to make changes to those rules).  The record also establishes that the Executive Committee of SFI, as opposed to its subsidiaries, was responsible for making final decisions regarding the disciplinary measures taken for violations of its harassment policies.  <u>Id.</u>, Ex. 19 (Sanderson Dep. 27-28) (testifying that the Executive Committee "was responsible for the final decisions regarding discipline for a violation of the [harassment] policy.").  The Court finds that as the subsidiaries were obligated to make all of their employment decisions in accordance with the employment policies established by

SFI, SFI exercised centralized control over the of labor and employment decisions of its subsidiaries. <u>See</u> <u>e.g.</u> <u>Baker</u>, 560 F. Supp. at 392 (finding that separate corporate enterprises were a single employer in a case in which one company issued policies that the other company was required to follow).

As the record demonstrates the existence of interrelation of operations, centralized control of labor and employment decisions, common management, and common ownership, the Court finds that SFI and SFI (production) should be considered a single employer for the purposes of White's discrimination claims.

**B.   Did SFI engage in unlawful employment discrimination?[4]**

The Court begins by recognizing that a claim of employment discrimination can be proven through direct evidence or circumstantial evidence. However, proving discrimination through direct evidence is difficult in most cases. <u>Crawford v. Formosa Plastics Corp., Louisiana</u>, 234 F.3d 899, 902 (5th Cir. 2000)(citation omitted). Therefore, in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court set forth a standard by which to analyze discrimination claims based on circumstantial evidence. <u>Reeves v.</u>

---

[4]   Claims of racial discrimination brought under 42 U.S.C. § 1981 are governed by the same evidentiary framework as is applicable to claims of employment discrimination brought under Title VII. <u>LaPierre v. Benson Nissan, Inc.</u>, 86 F.3d 444, 448 n.2 (5th Cir. 1996) (<u>citing</u> <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989)).

<u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)(citation omitted); <u>Evans v. City of Houston</u>, 246 F.3d 344, 350 (5th Cir. 2001).  This standard is known as the "<u>McDonnell Douglas</u> burden shifting analysis," or simply the "<u>McDonnell Douglas</u> analysis."

The first step in the <u>McDonnell Douglas</u> analysis is proof of a *prima facie* case of discrimination by the plaintiff.  The tests for proving a *prima facie* case vary slightly depending on the type of discrimination alleged.  However, each of the groups of tests is based on minor variations of the following four factors: (1) the plaintiff must be a member of a group protected by employment discrimination law of some type; (2) the plaintiff must be qualified for the employment position in question; (3) the plaintiff must have suffered an adverse employment action, i.e., the plaintiff was not hired or promoted, or the plaintiff was fired or demoted; and (4) someone outside of the plaintiff's protected class must have filled the employment position in issue. <u>Price v. Fed. Express Corp.</u>, 283 F.3d 715, 720 (5th Cir. 2002)(citation omitted).  "[E]stablishment of a *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against the employee." <u>Patrick v. Ridge</u>, 394 F.3d 311, 315 (5th Cir. 2004)(citation omitted).

If the plaintiff establishes a *prima facie* case of discrimination, then under <u>McDonnell Douglas</u> the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the employment decision in issue. <u>Patrick</u>, 394 F.3d at 315

(citation omitted).  This is a burden of *production* as opposed to a burden of *persuasion*, and no credibility assessment can be made at this phase. <u>Reeves</u>, 530 U.S. at 142 (citation omitted).  "As this is a burden of production, the employer need not prove that it was actually motivated by its proffered reason." <u>Patrick</u>, 394 F.3d at 315 (citation omitted).  However, "an employer must articulate a nondiscriminatory reason *with 'sufficient clarity'* to afford the employee a realistic opportunity to show that the reason is pretextual." <u>Id.</u> at 317 (emphasis in original)(citing <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 255-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  The employer's proffered reason for the employment decision may be subjective in nature, but it must be more than vague and conclusory opinions about the plaintiff. <u>Id.</u>

If the employer meets the burden of articulating a nondiscriminatory reason for its employment decision, then the presumption of discrimination created by plaintiff's *prima facie* case is nullified, and the inquiry becomes more fact specific. <u>Patrick</u>, 394 F.3d at 315 (citation omitted).  At this point, the <u>McDonnell Douglas</u> scheme shifts the burden back to the plaintiff to "show that the employer's putative legitimate, nondiscriminatory reason was not its real reason, but was merely a *pretext for discrimination*." <u>Id.</u> (emphasis added; citation omitted).

The <u>Crawford</u> court provided a guideline by which to measure whether an employer's reason for the employment decision was merely a pretext for discrimination.

> A mere scintilla of evidence of pretext does not create
> an issue of material fact in all cases.  As stated by the
> Supreme Court in Reeves, a plaintiff must present
> "*sufficient* evidence to find that the employer's asserted
> justification is false."  It is, therefore, possible for
> a plaintiff's evidence to permit a tenuous inference of
> pretext and yet be insufficient to support a reasonable
> inference of discrimination.  Likewise, if the evidence
> of pretext is substantial, the plaintiff may create a
> genuine issue of material fact without independent [or
> direct] evidence that discrimination was the real reason
> for the adverse employment action.  The determination
> must be made on a case-by-case basis, depending on the
> nature, extent, and quality of the evidence, as to
> whether a jury could reasonably infer discrimination.

Crawford, 234 F.3d at 902-03 (emphasis in original; internal citations omitted).  If the plaintiff creates a genuine issue of material fact on the pretext issue, then the case must proceed to trial.  Conversely, if plaintiff fails in this endeavor, then summary judgment must be granted in defendant's favor.

The ultimate question in any employment discrimination case is of course whether the plaintiff was a victim of intentional discrimination.  Reeves, 530 U.S. at 153.  Although the burdens of producing evidence shift back and forth under the McDonnell Douglas analysis, the ultimate burden of proving intentional discrimination remains with the plaintiff at all times.  Id. at 143 (citation omitted).

### 1.   Disparate treatment/discipline

White's 2002 claim of disparate treatment/discipline arises from a one-week suspension he received based on an alleged violation of the Work Rules governing standard operating procedure of SFI

14

(Production).  In order to state a prima facie claim of disparate treatment, White must establish "either that he did not violate the rule or that, if he did, white employees who were engaged in similar acts were not punished similarly.[5] Mayberry v. Voight Aircraft Co., 55 F.3d 1086, 1909 (5th Cir. 1980) (citations omitted).

The facts show that on October 22, 2002, White failed to transport a forklift to a job site even though he was assigned the first load from that site and, thus was the first driver to arrive. SFI contends this action violated company policy, under which the first driver is required to transport a forklift to a job site. White does not dispute whether he was the first driver to leave for the work site or the fact that he failed to transport a forklift. Instead, White alleges that he did not violate any policy or procedure.

In support of its motion, SFI has offered evidence to show that the truck driver who was assigned the first load was responsible for taking a forklift to the job site, and that all of the truck drivers were aware of this policy.  See Resp. to Mot. for Summ. J., Ex 92 (Jones Dep., at 44-45).  White likewise testified that "the first truck always" takes a forklift to the job site for the scheduled catch.  Id., Ex. 90 (White Dep., at 50).  White also testified, however, that the first driver was not required to transport a

_____

[5]  SFI does not contest that White is a member of a protected class or that he is qualified for his job for the purposes of any of his discrimination claims.

15

forklift if a crew was already at the job site unless instructed to do so by the supervisor.  Id. Ex. 90 (White Dep., at 74-75).  Based on the evidence before it, the Court finds that there is a genuine issue of material fact regarding whether SFI had a standard policy under which the first driver was always obligated to transport a forklift to every job site he was assigned, and therefore there is a genuine issue of material fact with regard to whether White violated that policy.  Accordingly, the Court finds that White has satisfied his prima facie burden with regard to this claim.

SFI has articulated a legitimate, non-discriminatory reason for White's suspension – i.e. that White was suspended in accordance with the applicable Work Rules.  Specifically, SFI claims that White's failure to transport the forklift resulted in the loss of one and one-half hours of production time, which constitutes willful negligence in violation of Section III (B)(6) of the SFI Work Rules.  Pursuant to that Section, such acts of negligence are subject to a one-week suspension.  Accordingly, White must now show that the reason articulated by SFI for his suspension – that he was suspended in accordance with the applicable Work Rules for willful negligence – was not its real reason, but merely a pretext for discrimination.  In this regard, White can establish pretext by either showing that the reason articulated by SFI is false, or by presenting evidence of disparate treatment.  Laxton v. Gap Inc. 333 F.3d 572, 578 (5th Cir. 2003).

The only argument offered by White is that "blacks were being written up in overwhelming numbers, that whites were not, that blacks were being terminated and replaced by whites, and the reason for his suspension is false based on the credible evidence." Mem. in Supp. of Resp, to Mot. for Summ. J., at 93.  First, the Court finds that these assertions are insufficient to establish pretext. See e.g. Murphee v. Potter, 226 F. Supp. 2d 826 (N.D. Miss. 2002). Second, in order to show pretext, a "plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001).  In the present case White has not presented any evidence to rebut the reasons articulated by SFI underlying his suspension, or to otherwise show that his suspension was not warranted under the subject Work Rules.  Even if SFI was incorrect in its determination that White had violated company policy by failing to transport a forklift, "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." Little v. Republic Ref. Co. Ltd., 924 F.2d 93, 97 (5th Cir. 1991).  See also Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 408 (5th Cir. 1999) ("Merely disputing [an employer's] assessment of [a plaintiff's] work performance will not necessarily support an inference of pretext.")

17

Finally, a plaintiff can demonstrate pretext by presenting evidence of disparate treatment. Laxton, 333 F.3d at 578. In this context, White has not presented any evidence to show that Caucasian drivers were not suspended (or otherwise received more favorable treatment) when they failed to transport forklifts as required by company policy or engaged in other conduct that constituted willful negligence under the Work Rules.

As White has failed to produce any evidence to support a finding that race was the motivating factor behind his suspension, the Court finds that SFI is entitled to summary judgment on this claim.

White also alleges disparate treatment/discipline from a series of written warnings he received relating to various deficiencies in his daily vehicle inspection reports and for allegedly refusing to water chickens. The Court finds that these claims are not properly before it as they were not alleged by White in his Complaint. As previously explained by this Court in a case in which it refused to allow a plaintiff to proceed on a discrimination claim that was not alleged in the complaint:

> The inclusion of some similar claims does not necessarily give the defendant notice of the claims asserted against them. This is specifically true in a case such as this, where Plaintiff alleged specific instances of Defendants' [discrimination] and failed to mention the ... claim she presently seeks to pursue. Defendants had no notice of any claims beyond those contained in the complaint until plaintiff's deposition. Also significant is the fact that Plaintiff has not attempted to

18

> amend her complaint, but even if Plaintiff did
> seek to amend her complaint, it is unlikely the
> Court would allow such amendment at this late
> stage in the litigation ...

Boykins v. Entergy Operations, Inc., Civil Action No.: 5:99cv60BN, slip op. at 9-10 (S.D. Miss. Mar. 2, 2000). See also Watts v. Entergy Operations, Inc., Civil Action No. 3:99cv63BN, slip op. at 8-9 (finding that the plaintiff was barred from raising new discrimination claims during discovery "because they were not included in the complaint, which Plaintiff has not sought to amend, and because they are all barred by the statute of limitations."). Accordingly, the Court finds that SFI is entitled to summary judgment on these claims.

The Court also finds that for these same reasons, SFI is entitle to summary judgment on White's claim of hostile environment. White did not allege a claim of hostile work environment in his Complaint, nor has he made any attempt to amend his Complaint to allege such claim. At best, White alleged that he experienced "extreme emotional distress and anxiety" over his termination and his discovery that SFI was providing negative job references to his prospective employers. See Complaint, 51 at ¶(kk). Additionally, while SFI conducted discovery regarding White's allegations of emotional distress, it does not appear that the claim of hostile environment was raised until White filed his response to the Motion for Summary Judgment. As discussed above, the Court finds that

White cannot now be permitted to proceed on a claim of hostile work environment.

**2.   Claim of Negative Job Reference Based on Race**

White alleges that after he was terminated, SFI gave negative job references to prospective employers that were made based on his race.  The Court first finds that White's allegations do not support a claim of disparate treatment.  In order to state a prima facie case of employment discrimination, a plaintiff must prove that he suffered an adverse employment action – i.e. that he was not hired, promoted, fired or demoted.  See Price, 283 F.3d at 720.  See also Dollis v. Ruben, 77 F.3d 777, 781–82 (5th Cir. 1995) (finding that the term "ultimate employment decisions" encompass employment matters "such a hiring, granting leave, discharging, promoting, and compensating.").  White has not cited any authority under which an employer's failure to give a good job reference post-termination constitutes an "adverse employment action" for the purposes of Title VII.  See Id., at 781 (finding that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers.").  Further, even if White's claim were actionable, he has failed to satisfy his burden of proving discriminatory intent.  The Fifth Circuit has found that a presumption of discriminatory intent is raised in cases in which "a supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under

circumstances that are essentially identical." Barnes v. Yellow Freight Sys., Inc., 778 F.2d 1096, 1101 (5th Cir. 1985).  In the case *sub judice*, White has not presented any evidence to show that Caucasian former employees of SFI were treated any differently with regard to the job references they received.  Finally, White has not presented any admissible evidence to show that SFI made any negative job references to prospective employers.  At best, White cites to an exhibit in the record that "reflects that White made a call to Cutrer [the FERM of SFI (Production)] advising him that a [prospective employer] said he could not be hired because Sanderson Farms gave him a bad reference."  Mem. in Supp. of Resp. to Summ. J., at 108.  The Court finds that this evidence is hearsay, is inadmissible, and is insufficient to show that there exists a genuine issue of material fact with regard to White's claim of disparate treatment based on negative job references.  Accordingly, the Court finds that SFI is entitled to summary judgment on this claim.

### 3.    Disparate Treatment/Pay

In order to establish a prima facie case of disparate treatment regarding pay, the plaintiff must establish that he was paid less than a member of a non-protected class for performing substantially the same work.  Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071 (5th Cir. 2001).  White's disparate pay claim is based on allegations that Caucasian live haul drivers received better load

21

assignments (and hence better pay) than he received in 2002. <u>See</u> Complaint, 46 at ¶¶ (b),(c). In support of his claim, White alleges that in July of 2002, Jerry Morris ("Morris"), a Caucasian driver, was moved onto his crew and subsequently "bumped" White on the hauling schedules. Mem. in Supp. of Mot. for Sum. J., at 99. White claims that after Morris was moved onto his crew, his Hammond loads dropped by about one-third, while Morris's Hammond loads doubled for the time-period between August 1, 2002, and December 2002. <u>Id.</u> White further alleges that the changes in load assignments caused him to earn approximately $700 less than Morris during the subject period of time.

There is no evidence to show that White was disparately treated with respect to load assignments. Contrary to his allegations, the record does not reflect a decrease in White's Hammond loads with a corresponding increase in Morris's Hammond loads. In fact, White actually received more Hammond loads (a total of twenty-five) than did Morris (a total of twenty-four) during the August 1, 2002, though the December 7, 2002 period. <u>See</u> Resp. to Mot. for Summ. J., Ex. 100(b). White also received more Hammond loads than at least two other Caucasian drivers. Further, while White established that he received less total pay than Morris, the record shows that he was paid more per week than at least one Caucasian driver, and that his weekly income exceeded that of Morris on eight occasions between May 4, 2002, and December 7, 2002. <u>See</u> Mot. for Summ. J., 5 n.10 (<u>citing</u> Affidavit and expert report of Mary Dunn Baker, Ph.D.).

The Court finds that even if White could establish a prima facie case of discrimination based on his allegations of disparate job assignments and pay, SFI has articulated a legitimate, non-discriminatory reason for the job assignments White received. Beginning on March 2, 2002, SFI implemented a policy by which live haul drivers, like White, were paid based on a load/mile system. Under this system, a driver's pay was varied based on the number and type of loads hauled, the number of miles driven, and the amount of down-time on each route. Mot. for Summ. J. (Romano Affidavit, 8 at ¶¶ 1-3). Sanderson contends that under this system, it is virtually impossible for the company to make all of the drivers' weekly earnings identical because "the drivers were driving to numerous different farms on different days, working varying schedules, loading different numbers of chickens at each farm on any given day, and driving different distances to the various farms." Mem. in Supp. of Mot. for Summ. J., 4-5.

White does not present any evidence to rebut the legitimate, non-discriminatory reasons given by SFI to explain the differences in load assignments or pay, but merely states that the "proffered excuse for his treatment is false." Mem. in Supp. of Resp. to Mot. for Summ. J., 99. Again, the Court finds that White has not shown that the reason offered by SFI to explain the variances in load assignments and pay was a pretext for discrimination. In fact, SFI has produced evidence to show that under the load/mile system, black drivers, as a group, were assigned a greater number of farm loads,

essentially the same number of Hammond loads, more miles and more hours of works as compared to their Caucasian counterparts. <u>See</u> Mot. for Summ. J. (Affidavit and Report of Dr. Baker).  There is also evidence in the record showing that under this system, the average earnings of black drivers were statistically similar to, or significantly greater than, the earnings of Caucasian drivers. <u>Id.</u> With regard to White specifically, the record shows that under the load/mile system he received more Hammond loads than at least three white drivers and that he was paid more than at least one Caucasian driver on a weekly basis.  White has not produced any evidence to rebut the legitimate, non-discriminatory reason articulated by SFI.

Accordingly, the Court finds that SFI is entitled to summary judgment on this claim.  The Court additionally finds that as White did not respond to the motion for summary judgment on his claim of disparate pay based on allegations that he was sent home in December of 2002 because of an alleged lack of work, SFI is likewise entitled to summary judgment on that claim.


**4.    Disparate Treatment/Termination**

In order to establish a prima facie case of disparate treatment based on termination, a plaintiff must establish that he was subject to an employment action – i.e. termination – under circumstances in which other similarly situated employees were treated more favorably. <u>Okoye v. University of Tex. Houston Health Science Ctr.</u>

245 F.3d 507, 513 (5th Cir. 2001).  White was terminated from his employment with SFI after being involved in a roll-over accident on December 11, 2002, that resulted in the death of 2,800 chickens, valued at $3,585.28.  In order to establish a prima facie case of discrimination, White must demonstrate that Caucasian live haul drivers who were involved in "nearly identical" accidents with the same resulting loss of life were not terminated.  See Okoye, 245 F.3d at 514 (finding that to establish disparate treatment in the form of termination, the plaintiff must show that the employer gave preferential treatment to another employee under "nearly identical circumstances," that is, "that the misconduct for which the plaintiff was discharged was nearly identical to that engaged by ... other employees.") (alterations in original) (citations omitted).

In support of his claim that Caucasian drivers were not terminated following accidents resulting in the loss of chickens, White first claims that Shawn Keeton was involved in an accident on April 25, 2003, in which 2,463 chickens were killed.  The Court finds, however, that White has not presented any credible evidence to support this claim.  First, the evidence shows that SFI (Production) has no record of an accident occurring on that date. Second, White's allegations are based on pure speculation. Specifically, Armond Mikell avers:

> Documents ... show that a driver named "Shawn
> Keeton" lost 2,463 live chickens on Trailer No.
> 647 on April 25, 2003 and that the chickens
> came from the Willie Farm.  That means that Mr.
> Keeton had some type of accident in order for

> there to be that kind of loss.  There is no
> other explanation for that many dead chickens
> in route.

See Resp. to Mot. for Summ. J., Ex. 105 (Mikell Affidavit, ¶ 8).

Mikell further averred: "Though I do not have person knowledge as

to why that many chickens died on his trailer that day, ... 2,400

chickens do not die unless some kind of accident takes place." Id.,

Ex. 105 (Mikell Affidavit, ¶ 10).  The Court additionally finds that

to be relevant, White has to prove that Keeton's alleged accident

occurred under "nearly identical circumstances," as his, and that

Keeton engaged in the same misconduct – i.e. caused a "serious

preventable accident" – as did White.  The Affidavit of Mikell

establishes neither.

White also claims that another white driver, Will Smith, had

an accident that resulted in the estimated death of 3,800 chickens.[6]

The Court cannot determine, based on the evidence presently before

it, whether this accident occurred under "nearly identical

circumstances" as the accident involving White.  For example, White

testified that his accident occurred on a muddy road when he

attempted to make a turn.  Resp. to Mot. for Summ. J., Ex. 90 (White

Dep. at 93-94).  According to White, as he was turning, the front

wheel of his truck started to slide into the ditch alongside the

road.  When attempting to straighten his truck, the trailer on the

---

[6]  The Court was not presented with the actual number of dead
birds.  A witness to the accidence approximated the loss based on
his belief that the driver would have lost the same number of
chickens as is typically lost with roll-over accidents.

back of the truck slid into the ditch.  Id., Ex. 90 (White Dep. at 93-94).  SFI contends that the accident was deemed a "serious preventable accident" under the Driver Safety Rules because White "could have prevented the accident by exercising proper care or diligence in making the turn" under the circumstances.  Mem. in Supp. of Mot. for Summ. J., 13.

As regards the Smith accident, Jonathan Robinson ("Robinson"), a witness to the alleged accident, testified he and the other drivers of his crew had been avoiding the middle road at a job site because "it had a couple of bad dips in it" and was muddy.  Resp. to Mot. for Summ. J., Ex. 94 (Robinson Dep. at 43-44).  Smith was not a member of Robinson's crew, but came to the job site with a later crew.  According to Robinson, he and his crew forgot to inform Smith that they were not using the middle road because it was in bad condition. Before they could stop him, Smith drove down the middle road, started sliding into a ditch alongside the road, and ultimately jack-knifed his truck and trailer causing his trailer to slide into the ditch.  Id., Ex. 94 (Robinson Dep. at 43-44).

The record shows that both the White and Smith accidents occurred on muddy roads, and the loss of chickens resulted because the trailer section of their respective vehicles slid into roadside ditches.  The Court, however, has not been provided any evidence or argument from SFI to explain the reasons that the Smith accident was not deemed a "serious preventable accident."  SFI has not produced any evidence with regard to this accident – it does not deny that

the accident occurred, it does not deny that a significant number of chickens were killed, and it does not deny that Smith was not terminated after the accident. SFI merely argues that Smith should not be considered a comparator to White because the latter has failed to prove that the accidents occurred under similar circumstances. The Court finds, however, based on the evidence presently before it, that White has established a prima facie case of disparate termination.

SFI claims that White was terminated based on a determination that the accident in which he was involved constituted a "serious preventable accident" under the Driver Safety Rules which warranted termination. The Court finds that SFI has articulated a legitimate, non-discriminatory reason for White's termination. Accordingly, White must now show that the reason articulated by SFI for his termination was not its real reason, but merely a pretext for discrimination. Again, to satisfy his burden, White may establish pretext "by showing that a discriminatory motive more likely motivated" SFI to terminate his employment "through evidence of disparate treatment, or that [his employer's] is unworthy of credence." <u>Wallace</u>, 271 F.3d at 220 (citations omitted). In this regard, White claims that black drivers were routinely being fired because Mike Stevens, the Live Haul Manager for the McComb facility wanted to replace black drivers with Caucasian drivers. In support of this claim, White has produced significant evidence to show that blacks were being terminated in large numbers, and were being

replaced by Caucasian drivers.  <u>See</u> Mem. in Supp. of Mot. for Summ.
J., 46-50,57-62 and supporting exhibits.  The Court finds that this
evidence is sufficient create a jury question on the issue of
pretext.  The Court also finds that White has presented sufficient
evidence to support a finding of pretext based on disparate
treatment.  Both parties will be permitted to introduce evidence
regarding whether the accidents involving White and Smith occurred
under nearly identical circumstances and, therefore, whether Smith
is a comparator to White.  In the event it is determine that the two
are not comparators, White will need to establish discrimination by
relying purely on the alleged wide-scale termination of African
Americans.

Based on the evidence in the record, the Court finds that White
has produced sufficient evidence to create a fact question with
regard to his discrimination claim based on disparate
treatment/termination.  Accordingly, the Motion of SFI for Summary
Judgment on this claim will be denied.


**IV. Conclusion**

For the foregoing reasons:

IT IS THEREFORE ORDERED that the Motion of Defendant for
Summary Judgment as to the Claims of Perry White [Docket No. 439]
is hereby granted in part, and denied in part.  SFI is granted
summary judgment on all of White's Title VII and Section 1981 claims

of discrimination with the exception of his claim for disparate treatment/termination.

IT IS FURTHER ORDERED that the Plaintiffs' Motion for Summary Judgment on the Affirmative Defenses raised by SFI [Docket No. 381] shall be held in abeyance until trial.

SO ORDERED this the 21st day of September, 2006.


                                        s/ William H. Barbour, Jr.
                                        UNITED STATES DISTRICT JUDGE